Ashley M. McDow (245114)
Fahim Farivar (252153)
**FOLEY & LARDNER LLP**
555 South Flower Street, Ste. 3500
Los Angeles, CA  90071-2411
Telephone:   213.972.4500
Facsimile:    213.486.0065
Email:       amcdow@foley.com
             ffarivar@foley.com

[Proposed] Attorneys for David K. Gottlieb,
Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>PORCHLIGHT ENTERTAINMENT, INC.,<br><br>Debtor. | Case No.: 1:13-bk-14983-MB<br><br>Jointly administered with:<br><br>Case No.: 1:13-bk-16040-MB<br><br>Chapter 7 |
| In re<br><br>PORCHLIGHT DISTRIBUTION, INC.,<br><br>Debtor. | **MOTION FOR ENTRY OF ORDER (A) APPROVING SALE OF THE ESTATES' RIGHTS, TITLES AND INTERESTS IN THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 363(B) AND (F), (B) FINDING BUYER QUALIFIES AS A GOOD FAITH PURCHASER PURSUANT TO 11 U.S.C. § 363(M), (C) APPROVING OVERBID PROCEDURES, AND (D) WAIVING FED. R. BANKR. P. 6004(H) STAY; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS IN SUPPORT THEREOF** |
| ■ Affects both Debtors<br><br>□ Affects Porchlight Entertainment, Inc. only<br><br>□ Affect Porchlight Distribution, Inc. only | **Hearing:**<br>Date:  August 15, 2018<br>Time:  11:00 a.m.<br>Place:  Courtroom 303<br>       U.S. Bankruptcy Court<br>       21041 Burbank Blvd.<br>       Woodland Hills, CA 91367 |

- 1 -

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 5

I.    INTRODUCTION ............................................................................................................ 5

II.   JURISDICTION AND VENUE ...................................................................................... 6

III.  STATEMENT OF FACTS .............................................................................................. 6

IV.   DISCUSSION ................................................................................................................ 12

    A.    Approval of the Sale under § 363(b) is Appropriate ........................................... 12

        1.    There Is a Sound Business Purpose for the Sale, the Sale is for a Fair and Reasonable Price and Is Being Proposed in Good Faith. ................... 12

        2.    Accurate and Reasonable Notice ............................................................ 14

    B.    Sale Free and Clear Pursuant to Section 363(f) is Appropriate ........................... 15

    C.    Sale Free and Clear is Appropriate under Section 363(f)(2) ............................... 15

    D.    The Sale Is Made in Good Faith and the Buyer Should Be Deemed to Be Good Faith Buyer ............................................................................................... 16

    E.    The Waiver of the Stay Is Appropriate ............................................................... 17

    F.    Approval of the Overbid Procedures is Warranted .............................................. 17

    G.    Payment of Commission Upon Closing Is Warranted ......................................... 19

    H.    Tax Consequences ............................................................................................. 19

V.    CONCLUSION ............................................................................................................. 20

MOTION FOR SALE OF THE ESTATES' RIGHTS, TITLES AND INTERESTS IN THE DEBTORS' ASSETS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 995 Fifth Ave.*,
    96 B.R. 28 ...............................................................................................................13

*In re America West Airlines*,
    166 B.R. 908 (Bankr. D. Ariz. 1994) .....................................................................12

*Cottle v. Storer Communication, Inc.*,
    849 F.2d 570 (11th Cir. 1988)...........................................................................13, 14

*In re Crowthers McCall Pattern, Inc.*,
    96 B.R. 879 ...............................................................................................................14

*CRTF Corp. v. Federated Dept. Stores*,
    683 F. Supp. 422 (S.D.N.Y. 1988) .........................................................................14

*Ewell v. Diebert (In re Ewell)*,
    958 F.2d 276 (9th Cir. 1992).....................................................................................16

*Hargrave v. Township of Pemberton (In re Tabone, Inc.)*,
    175 B.R. 855 (Bankr. D.N.J. 1994) .........................................................................15

*In re Integrated Resources, Inc.*,
    147 B.R. 650 (S.D.N.Y. 1992).................................................................................14

*In re James*,
    203 B.R. 449 (Bankr. W.D. Mo. 1997).....................................................................15

*In re Lionel Corp.*,
    722 F.2d 1063 (2nd Cir. 1983).................................................................................12

*New Haven Radio, Inc. v. Meister (In re Martin-Trigona)*,
    760 F.2d 1334 (2nd Cir. 1985).................................................................................12

*Onouli-Kona Land Co. v. Estate of Richards*,
    846 F.2d 1170, 1173 (9th Cir. 1988).......................................................................16

*In re S.N.A. Nut Co.*,
    186 B.R. 102 .............................................................................................................13

*In re Shary*,
    152 B.R. 724 (Bankr. N.D. Ohio 1993) ..................................................................15

*Stephens Indus., Inc. v. McClung*,
    789 F.2d 386 (6th Cir. 1986)...................................................................................12

*In re Walter*,
    83 B.R. 14 (B.A.P. 9th Cir. 1988) ....................................................................12, 13

*In re Wilde Horse Enterprises, Inc.*,
    136 B.R. 830 (Bankr. C.D. Cal. 1991) ....................................................................................12

*In re WPRV-TV*,
    983 F.2d 336 (1st Cir. 1993) ..................................................................................................12

**Statutes**

11 U.S.C. § 363(b) ....................................................................................................................12, 13

11 U.S.C. § 363(f) .....................................................................................................................11, 15

11 U.S.C. § 363(f)(2) ...............................................................................................................5, 6, 15

11 U.S.C. § 363(m) ..................................................................................................................5, 6, 16

11 U.S.C. § 541(a) ...........................................................................................................................7

28 U.S.C. § 157 ................................................................................................................................6

28 U.S.C. § 157(b)(2) ......................................................................................................................6

28 U.S.C. § 1334 ..............................................................................................................................6

28 U.S.C. § 1408 ..............................................................................................................................6

28 U.S.C. § 1409 ..............................................................................................................................6

**Rules**

Fed. R. Bankr. P. 2002(a)(2) ..........................................................................................................14

Fed. R. Bankr. P. 6004 ...................................................................................................................14

Fed. R. Bankr.P. 8002 ....................................................................................................................11

Loc. Bankr. R. 6004-1 ....................................................................................................................14

MOTION FOR SALE OF THE ESTATES' RIGHTS, TITLES AND INTERESTS IN THE DEBTORS' ASSETS

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTORS, ALL INTERESTED PARTIES AND/OR THEIR COUNSEL OF RECORD:**

David K. Gottlieb (the "Trustee" and/or the "Seller"), the duly appointed, qualified, and acting chapter 7 trustee for the bankruptcy estates (the "Estates") in the above-captioned, jointly administered bankruptcy cases (collectively, the "Bankruptcy Cases") of Porchlight Entertainment, Inc. ("PEI") and Porchlight Distribution, Inc. ("PDI" and, together with PEI, the "Debtors"), hereby moves for entry of an order: (1) approving the sale agreement (the "Sale Agreement") by and between the Trustee, and Legacy Distribution, LLC, a Georgia limited liability company (the "Buyer"), for the sale of the Estates' rights, titles, and interests in and to the Estates' properties, assets, and rights used in connection with the Debtors' entertainment development, production, and/or distribution business (the "Assets"), as set forth more fully herein, all of which have been assigned to the Trustee on behalf of the Estates, free and clear of all liens pursuant to 11 U.S.C. § 363(f)(2); (2) waiving the stay under Federal Rule of Bankruptcy Procedure ("FRBP") 6004(h); and (3) finding that the Buyer qualifies as a good faith purchaser under 11 U.S.C. § 363(m) (the "Sale Motion").

In support of the within the Sale Motion, the Trustee respectfully submits the following:

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Prior to the commencement of the Bankruptcy Cases, the Debtors developed, produced and distributed family-friendly films and television programming independently and in conjunction with a variety of entertainment companies through a series of licensing and distribution agreements. Since his appointment, the Trustee has continued to operate certain aspects of the Debtors' businesses in order to maintain the going concern value of the business pending liquidation.

After substantial arms-length negotiations, the Buyer has agreed to purchase the Assets for the sum of four hundred fifty thousand dollars and zero cents $450,000.00 (the "Purchase Price"), on an "as-is", "where is" basis (the "Sale"). The terms of the Sale are memorialized in the sale

agreement (the "Agreement"), a true and correct copy of which is attached to the Declaration of David K. Gottlieb (the "Gottlieb Decl.") as **Exhibit A** and incorporated herein by this reference. The Sale is conditioned upon the sale of the Assets free and clear of all liens, claims, interests, and encumbrances pursuant to 11 U.S.C. § 363(f)(2), entry of a finding that the Buyer constitutes a good faith purchaser under 11 U.S.C. § 363(m), and closing the first business day after the order approving the Sale (the "Sale Order") becomes a final order.  The Sale is subject to Court approval.

The Trustee believes that the Sale is in the best interest of the Estates and their creditors, as the Sale reflects the highest and best offer received for the Assets to date.  In addition, the Sale is subject to overbid in accordance with the overbid procedures outlined below.  Accordingly, and for the reasons set forth herein, the Trustee respectfully requests that the Court approve the Sale to the Buyer on the terms set forth herein.

## II.      JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.     STATEMENT OF FACTS

2.      On or about July 29, 2013, PEI commenced its bankruptcy case (the "PEI Bankruptcy Case") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Thereafter, on or about September 17, 2013, PDI commenced its bankruptcy case (the "PDI Bankruptcy Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On or about September 23, 2013, PEI filed a motion to jointly administer the Bankruptcy Cases, which motion was granted by Court order entered on or about September 25, 2013.

3.      On or about June 16, 2015, the Debtors moved to convert the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code.  On or about June 29, 2015, the Court entered an order granting the motion to convert and converting the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code.  Thereafter, on or about July 10, 2015, David K. Gottlieb was

1    appointed as chapter 7 trustee for the Estates.

2         4.    On or about July 30, 2015, the Debtors filed an application to employ Baker &

3    Hostetler LLP ("Baker") as general bankruptcy counsel (the "Baker Application"). *See* Docket

4    Entry ("D.E.") 295. On or about September 18, 2015, the Court entered an order granting the

5    Baker Application and approving the employment of the Firm. *See* D.E. 310.

6         5.    Prior to the appointment of the Trustee, the Debtors were engaged in the

7    development, production and/or distribution of various forms of entertainment, including, without

8    limitation, films and television programs. In the course of the enterprise, the Debtors developed,

9    produced and/or distributed, among other titles, the *Tutenstein* and the *Jay Jay the Jet Plane* films

10   and television series. Upon the commencement of the Bankruptcy Cases, any and all assets of the

11   Debtors became assets of the Estates pursuant to 11 U.S.C. § 541(a) (the "Assets").

12        6.    On or about December 22, 2015, the Trustee filed the *Motion for Order*

13   *Authorizing Trustee to Operate the Business of the Debtors* (the "Initial Motion to Operate"). *See*

14   D.E. 360. By and through the Initial Motion to Operate, the Trustee sought authority to operate

15   the Debtors' business and, to the extent necessary, utilize cash collateral in the operation of the

16   Debtors' business (the "Business"). *See Ibid.* On or about January 26, 2016, the Court granted

17   the Initial Motion to Operate and entered an order authorizing the Trustee to operate the Business

18   (the "Operating Order"). *See* D.E. 360.

19        7.    On or about October 16, 2015, the Trustee entered into a stipulation (the "Fox

20   Assumption Stipulation") with Twentieth Century Fox Film Corporation ("Fox") to assume the

21   Distribution & Other Rights Acquisition Agreement dated as of March 21, 1996 (the "Fox

22   Distribution Agreement"), which authorized Fox to exploit the animated television series titled

23   *Adventures from the Book of Virtues* in certain identified territories. *See* D.E. 329. On or about

24   October 20, 2015, the Bankruptcy Court entered an order approving the Fox Assumption

25   Stipulation (the "Fox Assumption Order") and, thereby, the assumption of the Fox Distribution

26   Agreement. *See* D.E. 332.

27        8.    On or about January 26, 2016, the Trustee and Fox entered into a stipulation to

28   amend the Fox Assumption Stipulation and order approving the same (the "Amended Assumption

Stipulation"). *See* D.E. 375.  On or about February 1, 2016, the Bankruptcy Court entered an

order approving the Amended Assumption Stipulation and amending the Fox Assumption Order.

*See* D.E. 379.

9.      On or about December 23, 2015, the Trustee filed the *Amended Omnibus Motion*

*to Assume Executory Contracts* (the "Assumption Motion"), through which the Trustee moved to

assume certain distribution agreements (collectively, the "Distribution Agreements"). *See* D.E.

362.  On or about January 26, 2016, the Bankruptcy Court entered an order granting the

Assumption Motion and approving the assumption of the Distribution Agreements. *See* D.E. 373.

10.     The initial term of the Operating Order expired July 26, 2016. *See Ibid*.  As such,

on or about July 8, 2016, the Trustee filed the *Motion to Extend Effective Term of Order*

*Authorizing Trustee to Operate the Business of the Debtors* (the "First Extension Motion"). *See*

*Ibid*.  Through the First Extension Motion, the Trustee sought to extend the term of the

Operating Order, primarily to facilitate ongoing negotiations with Abadi & Co. ("Abadi"). *See*

*Ibid*.  On or about August 15, 2016, the Court entered an order granting the First Extension

Motion and extending the effective term of the Operating Order to January 26, 2017. *See* D.E.

398.

11.     On or about August 6, 2016, the Trustee entered into a *Settlement and Mutual*

*Release Agreement* (the "Abadi Settlement") with Abadi to resolve a dispute regarding the

respective rights of the parties to the *Tutenstein* and *Jay Jay the Jet Plane* film and television

series. *See* D.E. 411.  Pursuant to the Abadi Settlement, the Trustee and Abadi agreed to a joint

sale of the film and television programs identified on Schedule A to the Abadi Settlement,

including, without limitation, any and all copyrights, trademarks, domain names, websites,

recordings, masters, and/or promotional materials. *See Ibid*.

12.     In accordance with Paragraph 3 of the Abadi Settlement, the parties agreed to

divide the proceeds from the sale of the Assets in which Abadi has an interest as follows: (A)

first, to pay any and all closing costs and commissions associated with the sale of the Assets; (B)

second, to reimburse (i) Abadi for any costs incurred pursuant to Paragraph 2.c. of the Abadi

Settlement, and (ii) the Estates for reasonable costs incurred by the Estates after June 29, 2015;

and (C) third, to divide the remaining proceeds between Abadi and the Estates, with Abadi receiving 65% of the net sale proceeds from the sale of the Assets in which Abadi has an interest and the Estates receiving the remaining 35% of the net sale proceeds. *See Ibid*.

13.    Pursuant to Paragraph 5 of the Abadi Settlement, Abadi consented to the sale of the Assets free and clear of any and all purported liens, claims, interests, or encumbrances Abadi has, had, or may have in the Assets, subject to Paragraphs 2.d and 2.e. of the Abadi Settlement. *See Ibid*.

14.    Thereafter, the Trustee entered into stipulations with Reel Works Studios ("Reel Works") and Animalia Productions Pty, Ltd. ("Animalia Productions"), thereby confirming that any and all of the rights, title, and interests the Debtors may have held in *The Ultimate Gift* and *Animalia*, respectively, terminated prior to the commencement of the Bankruptcy Cases and, thus, were not subject to sale by the Estates pursuant to the Abadi Settlement or otherwise.

15.    Additionally, on or about November 18, 2016, the Trustee entered into a stipulation with Fox acknowledging that (i) Fox retains its rights under the Fox Distribution Agreement and (ii) Fox asserts a security interest in the *Adventures from the Book of Virtues* (the "Fox Retention Stipulation"). *See* D.E. 418.  On or about December 15, 2016, the Court entered an order approving the Fox Retention Stipulation. *See* D.E. 428.

16.    In the Fox Retention Stipulation, the parties acknowledged that the Trustee will seek to sell the Assets, including the *Adventures from the Book of Virtues*, free and clear of all liens and encumbrances. *See* D.E. 428.  In the event of a sale of the Assets, the parties agreed that any security interest Fox may have in the *Adventures from the Book of Virtues* will attach to the proceeds of the sale attributable to the *Adventures from the Book of Virtues*. *See Ibid*.

17.    On or about November 4, 2016, the Trustee filed an application to employ Focus Advisory Services, LLC ("Focus") as intellectual property broker for the Estates (the "Focus Application") to assist in his sale efforts.  On or about December 15, 2016, the Court granted the Focus Application (the "Focus Order").  As compensation for its work on behalf of the Estates, Focus would receive (i) an advance of $2,500.00 to cover, among other things, the costs and expenses of creating the pitch deck and digital data room, and (ii) a commission on the gross sale

proceeds equal to fifteen percent (15%) of the first four hundred fifty thousand dollars and zero cents ($450,000.00) in gross proceeds and seventeen and one half percent (17.5%) of gross proceeds in excess of four hundred fifty thousand dollars and zero cents ($450,000.00).  On or about December 15, 2016, the Court approved the Focus Application. *See* D.E. 429.

18.    Immediately after the entry of the Focus Order, Focus initiated his marketing efforts by specifically targeting the individuals and/or entities that he thought were prospective buyers.  Focus also contacted potential buyers to determine if they were interested in purchasing the Assets and made himself available to answer any and all their questions and/or concerns.

19.    On or about December 29, 2016, the Court entered an order approving the Abadi Settlement, as modified and clarified pursuant to the related stipulations with Reel Works and Animalia Productions and the Fox Retention Stipulation. *See* D.E. 436.

20.    On or about January 18, 2017, the Trustee filed the *Second Motion to Extend Effective Term of Order Authorizing Trustee to Operate the Business of the Debtors* (the "Second Motion to Extend"). *See* D.E. 439.  Through the Second Motion to Extend, the Trustee sought to further extend the term of the Operating Order to maintain the value of the Business and the Debtors' assets pending a sale of the same. *See Ibid*.  On or about February 24, 2017, the Court entered an order granting the Second Extension Motion and extending the effective term of the Operating Order to July 26, 2017. *See* D.E. 445.

21.    On or about July 21, 2017, the Trustee filed the *Third Motion to Extend Effective Term of Order Authorizing Trustee to Operate the Business of the Debtors* (the "Third Extension Motion"). *See* D.E. 452.  Through the Third Extension Motion, the Trustee sought an extension of the Operating Order to maintain the value of the Assets in anticipation of a sale of the same.  On or about September 22, 2017, the Court entered an order granting the Third Extension Motion and extending the effective term of the Operating Order to January 26, 2018. *See* D.E. 457.

22.    To continue to maintain the value of the Assets prior to a sale, on or about January 24, 2018, the Trustee filed the *Fourth Motion to Extend Effective Term of Order Authorizing Trustee to Operate the Business of the Debtors* (the "Fourth Extension Motion"). *See* D.E. 463. On February 22, 2018, the Court entered an order granting the Fourth Extension Motion and

1    extending the effective term of the Operating Order to July 26, 2018. *See* D.E. 465.

2        23.    As a result of this marketing plan and persistent marketing efforts, the Trustee has

3    received several offers to purchase the Assets, which the Trustee continues to entertain and

4    negotiate with such potential purchasers.

5        24.    On or about April 30, 2018, Ashley M. McDow ("Ms. McDow"), lead bankruptcy

6    counsel to the Trustee, resigned from the partnership of Baker and became a member of the

7    partnership of Foley & Lardner LLP (the "Firm"). Shortly thereafter, the Trustee indicated that

8    he wished to (continue to) be represented by Ms. McDow and the Firm, given primarily Ms.

9    McDow's significant and long-standing knowledge and experience with the Bankruptcy Cases.

10   Accordingly, on or about June 14, 2018, the Trustee file the application to employ the Firm as his

11   general insolvency counsel, effective May 2, 2018, which is currently pending approval of the

12   Court (the "Foley Application) [D.E. 473].

13       25.    After diligently marketing the Assets for sale, the Trustee received the Buyer's

14   offer to acquire the assets, subject to Court approval, with the following material terms of the

15   Sale:

16       a.    Buyer: Legacy Distribution, LLC;

17       b.    Purchase Price: Four hundred fifty thousand dollars and zero cents $450,000.00

18           (the "Purchase Price");

19       c.    Deposit: Thirty-five thousand dollars and zero cents ($35,000.00);

20       d.    Conditions of the Assets: The Assets shall be sold "as-is", "where is" and without

21           any representations or warranties, and free and clear of any and all liens and

22           encumbrances to the extent permitted by 11 U.S.C. § 363(f);

23       e.    Closing Date: The first business day after the Sale Order becomes a Final Order,[1]

24           but no later than thirty (30) days after the order approving the sale (the "Sale

25           Order") becomes a Final Order;

26   ─────────────────────

27   [1] An order shall be deemed a "Final Order" fifteen (15) calendar days after its entry *provided that* (a) no timely appeal has been filed challenging the order or, (b) if a timely appeal has been filed, no order staying the effect of the order has been requested or entered. A notice of appeal shall be deemed timely if filed

28   within the time allotted under Federal Rule of Bankruptcy Procedure 8002.

f.    Buyer Protection: Break-up fee of ten thousand dollars and zero cents ($10,000.00)
(the "Break-Up Fee") should the Buyer not be the winning bidder (as defined
*infra*); and

g.    Broker's Commission: Fifteen percent (15%) of the first four hundred fifty
thousand dollars and zero cents ($450,000.00) in gross proceeds and seventeen and
one half percent (17.5%) of gross proceeds in excess of four hundred fifty
thousand dollars and zero cents ($450,000.00) (the "Commission").

## IV.    DISCUSSION

### A.    Approval of the Sale under § 363(b) is Appropriate

Pursuant to 11 U.S.C. § 363(b), a trustee may, with court approval, sell property of the
estate outside the ordinary course of business.  A proposed sale of estate property will be
approved if it is in the best interests of the estate, based on the facts and history of the case.  *In re
America West Airlines*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (citing *In re Lionel Corp.*, 722
F.2d 1063, 1071 (2nd Cir. 1983)).  A court has broad discretion to authorize a sale under 11
U.S.C. § 363(b).  *See In re Walter*, 83 B.R. 14, 19 (B.A.P. 9th Cir. 1988); *see also In re
WPRV-TV*, 983 F.2d 336, 340 (1st Cir. 1993); *New Haven Radio, Inc. v. Meister (In re
Martin-Trigona)*, 760 F.2d 1334, 1346 (2nd Cir. 1985); *Lionel*, 722 F.2d at 1069; *Stephens
Indus., Inc. v. McClung*, 789 F.2d 386, 390-91 (6th Cir. 1986).

Generally, courts will find that a proposed sale is in the best interests of the estate where
there is a sound business purpose for the sale, the sale is for a fair and reasonable price, there is
accurate and reasonable notice to creditors, and the sale is made in good faith.  *In re Wilde Horse
Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991); *In re Lionel Corp.*, 722 F.2d 1063,
1069 (2d Cir. 1983).  The Trustee submits that the Sale meets the foregoing criteria.

#### 1.    *There Is a Sound Business Purpose for the Sale, the Sale is for a Fair and Reasonable Price and Is Being Proposed in Good Faith.*

The Ninth Circuit in *In re Walter*, 83 B.R. 14 (Bankr. 9th Cir. 1988) has adopted a
flexible, case by case test to determine whether the business purpose for a sale justifies
disposition of property of the estate under § 363(b).  In *Walter*, the court, adopting the reasoning

of the Fifth Circuit in *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986), and the Second Circuit in *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983), set forth the following standard to be applied under § 363(b).

> Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in Lionel, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the assets to the estate as a whole, the amount of lapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*In re Walter*, 83 B.R. at 19-20, *quoting In re Continental Air Lines, Inc.*, 780 F.2d at 1226.

The Sale is supported by a valid business justification, and the Trustee believes that the Sale support the Trustee's business decision that the Sale is in the best interest of the Estates and their creditors. The Trustee employed an experienced and knowledgeable intellectual property broker to help devise a plan to effectively market and value the Assets. The Trustee marketed the Assets for sale for more than one year before entering into the Agreement. During that time, the Trustee aggressively priced the Assets in an effort to obtain the highest and best price for the Assets. The offer made by the Buyer was the highest and best offer. Based on the amount of the Purchase Price and the Buyer's demonstrated ability to close, the Trustee concluded the Purchase Price was the highest and best offer for the Assets. Additionally, the Trustee believes the terms reflected in the Agreement are in the best interest of the Estates.

The Break-Up Fee provided for the Buyer in case of a successful overbid is also reasonable under the circumstances. In the bankruptcy context, a break-up fee is generally permissible "if reasonably related to the bidder's efforts and the transaction's magnitude." *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 578 (11th Cir. 1988); *In re 995 Fifth Ave.*, 96 B.R. at 28. Whether the payment of a break-up fee is appropriate is evaluated under the "business judgment rule." *In re S.N.A. Nut Co.*, 186 B.R. at 102. In evaluating the appropriateness of a

break-up fee, courts generally consider "whether the break-up fee served any of three possible

useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard

or minimum for other bidders to follow; or (3) to attract additional bidders." *In re Integrated*

*Resources, Inc.*, 147 B.R. 650, 662 (S.D.N.Y. 1992). Additionally, so long as the break-up fee or

overbid increment is not (1) the product of self-dealing by the debtor or the trustee, (2) likely to

hamper or chill, rather than encourage, bidding on the assets to be sold, or (3) unreasonably large

in relation to the proposed purchase price, courts have approved the proposed procedures. *See,*

*e.g., In re Integrated Resources, Inc.*, 147 B.R. 650, 657 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.

3d 49 (2d Cir. 1993) (a break-up fee is permissible if reasonably related to the bidder's efforts and

the transaction's magnitude); *see also Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 578-79

(11th Cir. 1988); *CRTF Corp. v. Federated Dept. Stores*, 683 F. Supp. 422, 440 (S.D.N.Y. 1988);

*In re Crowthers McCall Pattern, Inc.,* 96 B.R. at 879.

      The Trustee respectfully submits that the Break-Up Fee is reasonable under the

circumstances presented. The Buyer has assumed the risks of serving as the stalking horse bidder

for the proposed Sale. For instance, the Buyer has incurred fees and expenses in connection with

the Agreement, and it is likely that the Buyer will continue incurring legal and transactional

expenses up and through the Closing Date. In addition, the Break-Up Fee is not the product of

self-dealing by the Trustee. The Trustee is not affiliated with the Buyer, and will receive no

personal benefit from the proposed transaction. Moreover, the Break-Up Fee is not likely to

hamper or chill bidding on the Assets. Moreover, the amount of the Initial Overbid ensures that

the Break-Up Fee can be satisfied while still presenting the entirety of the Purchase Price for the

Estates. Finally, the Break-Up Fee is not unreasonably large as compared to the Purchase Price.

      Based on the foregoing, the Trustee respectfully submits that the Sale is in the best

interests of the Estates and their creditors and, as a result, should be approved.

### 2.    *Accurate and Reasonable Notice*

      Notice of this Sale Motion (the "Notice") has been provided to all interested parties in

accordance with FRBP 2002(a)(2) and 6004 and Local Bankruptcy Rule 6004-1. The Notice

provides notice of the terms of the Sale and identification of the Assets for which authority to sell

1    is being requested.  Accordingly, the Trustee respectfully submits that the Notice is appropriate.

2       **B.    Sale Free and Clear Pursuant to Section 363(f) is Appropriate**

3          The Trustee is seeking authority to sell the Assets free and clear of all interest, liens,

4    claims, and encumbrances pursuant to section 363(f).  Pursuant to section 363(f), the Trustee may

5    sell the Assets free and clear of any interest if the secured creditors' consent or their interests, if

6    any, are sufficiently protected.  *See* 11 U.S.C. § 363(f).  Because §363(f) is written in the

7    disjunctive, authority to sell the Assets free and clear of any and all liens, claims, and interests

8    should be granted if any of the conditions are met with respect to each creditor and/or interest

9    holder.

10      **C.    Sale Free and Clear is Appropriate under Section 363(f)(2)**

11         The sale of the Assets free and clear of all encumbrances is appropriate under

12   section 363(f)(2).  This Sale Motion is being served on all interested parties.  Thus, to the extent

13   any secured creditor does not object to the relief sought by and through this Sale Motion, they

14   each may be deemed to have consented to the sale free and clear of their lien, claim, or interest

15   pursuant to § 363(f)(2).  *See, e.g., In re James*, 203 B.R. 449, 453 (Bankr. W.D. Mo. 1997)

16   (holding that a sale free and clear of liens could not be set aside because the secured creditor

17   implicitly consented based on its failure to object to the sale); *Hargrave v. Township of*

18   *Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 857 (Bankr. D.N.J. 1994) (and cases cited therein)

19   (holding that a creditor that didn't object to a sale free and clear of its lien after receiving notice

20   of the opportunity to do so had consented to the sale for purposes of § 363(f)(2); *In re Shary*, 152

21   B.R. 724, 725 (Bankr. N.D. Ohio 1993) (same).

22         As set forth in Section III above, pursuant to paragraph 5 of the Abadi Settlement, Abadi

23   has consented to the sale of the Assets free and clear of any and all purported liens, claims,

24   interests, or encumbrances Abadi has, had, or may have in the Assets.  Moreover, through the Fox

25   Retention Stipulation, Fox has already agreed to a sale of the Assets free and clear of liens,

26   subject to any security interest in favor of Fox attaching to the proceeds of a sale of the portion of

27   the Assets, to which Fox contends its security interest attaches.  As such, the Trustee may sell the

28   Assets free and clear of any interest in the Assets pursuant to § 363(f)(2).

- 15 -

**D.    The Sale Is Made in Good Faith and the Buyer Should Be Deemed to Be Good Faith Buyer**

The Buyer qualifies as a good faith purchaser pursuant to 11 U.S.C. § 363(m), which provides as follows:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  A good faith buyer "is one who buys 'in good faith' and 'for value.'" *Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 281 (9th Cir. 1992) *citing In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).  "[L]ack of good faith is [typically] shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *Id*. quoting *Community Thrift & Loan v. Suchy (In re Suchy)*, 786 F.2d 900, 902 (9th Cir. 1985).  "[T]he primary goal of the mootness rule [embodied in section 363(m)] 'is to protect the interest of a good faith purchaser … of the property,' thereby assuring finality of sales." *Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*, 846 F.2d 1170, 1173 (9th Cir. 1988) *quoting Community Thrift & Loan v. Suchy (In re Suchy)*, 786 F.2d 900,901-02 (9th Cir. 1985).

The Buyer has acted in good faith and has agreed to pay fair market value for the Assets.  The present transaction was negotiated at "arm's length" between the Trustee and the Buyer.  Additionally, the Buyer is not an insider of the Trustee or either of the Debtors and no insider of the Trustee or either of the Debtors will receive special treatment as a result of the Sale.  Furthermore, the Assets were sufficiently marketed to a wide range of potential purchasers, and the Sale is subject to the overbid procedures outlined below.  For these reasons, the Trustee respectfully requests that the Court find that the Buyer qualifies as a "good faith purchaser" under 11 U.S.C. § 363(m).

///

**E.    The Waiver of the Stay Is Appropriate**

Under FRBP 6004(h), an order authorizing the sale of property is stayed for 14 days after the entry of the order, unless the court orders otherwise.  FRBP 6004(h).  The Advisory Committee Notes to FRBP 6004(h) state that the court may, in its discretion, order that the stay is inapplicable so that the sale or assumption may take place immediately upon entry of the order.  FRBP 6004(h) Advisory Committee's Note.

Here, the waiver of the stay imposed by FRBP 6004(h) is appropriate.  Time is of the essence in obtaining a final order approving the Agreement and Sale to the Buyer so that the Trustee is able to expeditiously close the Sale.  Additionally, waiver will not result in any prejudice.  The Assets has been thoroughly marketed and all parties in interest have already received or will receive notice of the sale.  Additionally, the Trustee does not anticipate any material opposition to the Sale Motion, the proposed purchase price for the Assets, or the anticipated distribution(s) to be made on account of allowed claims.  Furthermore, waiver of the fourteen 14-day stay would not adversely affect any parties' right to appeal an order approving the Sale.  Accordingly, the Trustee requests that the Court waive the stay imposed by FRBP 6004(h).

**F.    Approval of the Overbid Procedures is Warranted**

The proposed Sale is subject to overbid (the "Overbid Auction"), which is designed to ensure the Estates receive the highest and best price for the Assets.  In association with the proposed Overbid Auction, the Trustee proposes the following procedures (the "Overbid Procedures"):

1.    Notice of Intent to Bid/Deposit.  Any party interested in bidding on the Assets during the Overbid Auction shall submit a written notice of intent to bid along with a cashiers' check in the amount of thirty five thousand dollars and zero cents ($35,000.00) (the "Overbid Deposit") the Purchase Price to the Trustee via cashier's check no less than two (2) business days prior to the date of the Sale Hearing first scheduled for the Sale Hearing (individually and collectively, the "Overbid Deposits");

2.      Minimum Initial Overbid/Bid Increments.  The minimum initial overbid during the

Overbid Auction shall be no less than four hundred seventy five thousand dollars and zero cents

($475,000.00) (the "Initial Overbid") and, thereafter, each overbid shall be no less than ten

thousand dollars and zero cents ($10,000.00) (the "Bidding Increment") more than the

immediately preceding bid;

3.      Proof of Ability To Overbid: On the date of the Overbid Auction, any bidder

(other than the Buyer) who has complied with the procedures in section (F)(1) identified herein

and who is interested in presenting one or more overbid(s) at the Overbid Auction shall be

required to present a cashiers' check(s) to the Trustee evidencing the maximum amount he/she/it

is willing and able to overbid.  In no event shall this amount be less than the amount set forth in

section (F)(2) for the Initial Overbid;

4.      Back-up Bidder.  If multiple offers are presented during the Overbid Auction, the

highest and best offer shall be selected as the winning bid (the "Winning Bidder").  The

individual or entity that offered the next highest and best offer (the "Back-up Bid") may elect to

serve as the back-up bidder (the "Back-up Bidder").  In the event that (i) the Winning Bidder

(other than the Purchaser) fails to close the Sale within the time allotted; (ii) the Purchaser has

elected to serve as the Back-up Bidder; and (iii) the Purchaser fails to purchase the Assets within

the time allotted, the Trustee shall solely retain or be entitled to recover the Deposit or Overbid

Deposit, as applicable, as liquidated damages;

5.      Overbid Deposit Return.  With the exception of the funds submitted by the

Winning Bidder and/or Back-up Bidder, all Overbid Deposits shall be returned no later than five

(5) business days after the conclusion of the Overbid Auction.  If the Winning Bidder closes on

the Sale, the Back-up Bidder shall be entitled to the return of his/her/its Overbid Deposit and/or

any and all funds remitted to the Trustee in furtherance of the Purchase of the Assets no more

than five (5) business days after the Closing Date;

6.      Bidding Order.  Bidding during the Overbid Auction shall begin with the highest

qualified overbid submitted prior to the Overbid Auction.  During the Overbid Auction, the Buyer

shall be entitled to offer the first bid in response to the opening bid.  Thereafter, the order for the

1    submission of bids shall be governed by the time at which the overbids were submitted prior to

2    the Overbid Auction—the earliest overbid being entitled to submit the first bid after the Buyer.

3    Bidding shall continue until a Winning Bidder and Back-up Bidder are selected; and

4         7.    No Telephonic Participation Permitted By Overbidders.  Except for the Purchaser

5    or the Purchaser's designated agent, any overbidder who wishes to participate in the Overbid

6    Auction must be present (whether in person or through a designated agent) thereat; no telephonic

7    participation at the Overbid Auction will be permitted (except for the Purchaser or the

8    Purchaser's designated agent).

9         The Trustee respectfully submits that the preceding procedures and requirements will

10   serve to deter any casual bidders and protect the interests of the Estates.  The Trustee further

11   submits that the amount of the Initial Overbid (twenty five thousand dollars and zero cents

12   ($25,000.00) above the Purchase Price) is reasonable in light of the amount of the Purchase Price

13   (i.e., four hundred fifty thousand dollars and zero cents ($450,000.00), and is not designed or

14   intended to deter *bona fide* parties or chill bidding.

15        **G.    Payment of Commission Upon Closing Is Warranted**

16        As the Trustee seeks to sell the Property Assets free and clear of all liens and

17   encumbrances, the Trustee believes that payment of brokers' the Commissions should be made

18   paid immediately following the Closing Date. upon the close of the Sale.  Pursuant to the Broker

19   Order, the Broker is entitled to an advance of $2,500 (the "Advance") in addition to the

20   Commission.  Based on the foregoing, the Trustee requests authority to pay the Advance and the

21   Commission in full on the Closing Date and/or immediately thereafter without further order of the

22   Court.

23        **H.    Tax Consequences**

24        The Trustee does not anticipate that any tax consequences will result from the sale of the

25   Assets.  However, if any taxes are owed by one or both of the Estates on account of the Sale, the

26   Trustee shall pay the same in accordance with the Bankruptcy Code and any and all other

27   applicable law.

28   *///*

**V.    <u>CONCLUSION</u>**

Based on the preceding, the Trustee respectfully requests that the Court enter an order:

1)    granting the Sale Motion in its entirety;

2)    approving the Agreement;

3)    finding that the Notice, and notice of the Sale is sufficient, proper and complies with all applicable provisions of the Bankruptcy Code, FRBP, and LBR;

4)    approving the Overbid Procedures;

5)    authorizing the Trustee to sell the Assets to Buyer pursuant to the Agreement free and clear of any and all interests, liens, claims and encumbrances pursuant to sections 363(b) and (f);

6)    authorizing the Trustee to pay the Advance, Commission and any and all reasonable costs of Sale;

7)    Finding that any security interest in favor of Fox shall attach to the proceeds of the Sale of any of the Assets in which Fox has a valid and enforceable security interest;

8)    finding that the Buyer qualifies as a good faith purchaser under section 363(m);

9)    authorizing the Trustee to take any and all actions and/or execute any and all documents reasonably necessary to effectuate or consummate the Sale;

10)    waiving the fourteen (14) day stay imposed by FRBP 6004(h); and

11)    granting such further and additional relief the Court may deem just and proper.

Dated:    July 19, 2018                 Respectfully submitted,

                                        **FOLEY & LARDNER LLP**

                                        By:    _/s/ Ashley M. McDow_
                                               Ashley M. McDow

                                        Attorneys for DAVID K. GOTTLIEB,
                                        Chapter 7 Trustee

MOTION FOR SALE OF THE ESTATES' RIGHTS, TITLES AND INTERESTS IN THE DEBTORS' ASSETS

1    **DECLARATION OF DAVID K. GOTTLIEB**

2    I, David K. Gottlieb, hereby declare:

3    1.    I am the duly appointed, qualified, and acting chapter 7 trustee for the Estates in

4    the Bankruptcy Cases.  I submit this declaration in support of the *Motion for Entry of Order (A)*

5    *Approving Sale of the Estates' Rights, Titles and Interests in the Debtors' Assets Free and Clear*

6    *of Liens and Encumbrances Pursuant to 11 U.S.C. § 363(b) and (f), (B) Finding Buyer Qualifies*

7    *as a Good Faith Purchaser Pursuant to 11 U.S.C. § 363(m), (C) Approving Overbid Procedures,*

8    *and (D) Waiving Fed. R. Bankr. P. 6004(h) Stay* (the "Sale Motion").  Unless otherwise defined

9    herein, all capitalized terms shall have the same meaning as ascribed to them in the Sale Motion.

10    2.    Unless otherwise stated, I have personal knowledge of the matters set forth herein,

11    and if called as a witness, could and would competently testify to the same.

12    3.    I have reviewed the representations in the Sale Motion, and believe them to be true

13    and correct to the best of my knowledge.

14    4.    Shortly after the conversion of the Debtors' cases to a chapter 7 case, I was

15    appointed as chapter 7 trustee for the Estates and henceforth have served in that capacity.

16    5.    On or about December 22, 2015, I filed the Initial Motion to Operate.  Since then,

17    I have operated the Business in an effort to preserve the value of the Assets for the benefit of the

18    Estates.

19    6.    On or about October 16, 2015, I entered into the Fox Assumption Stipulation,

20    which authorized Fox to exploit the animated television series titled *Adventures from the Book of*

21    *Virtues*.  Fox and I subsequently executed a second stipulation regarding the Fox Distribution

22    Agreement, amending certain portions of the Fox Assumption Stipulation.

23    7.    On or about August 6, 2016, Abadi and I executed the Abadi Settlement, whereby

24    we agreed to a joint sale of the Assets, including, without limitation, any and all copyrights,

25    trademarks, domain names, websites, recordings, masters, and/or promotional materials.

26    8.    Subsequently, I entered into stipulations with Reel Works and Animalia

27    Productions, confirming that any and all of the rights, title, and interests the Debtors may have

28    held in *The Ultimate Gift* and *Animalia*, respectively, terminated prior to the commencement of

the Bankruptcy Cases and were not subject to sale by the Estates.

9.      Additionally, I entered into a stipulation with Fox acknowledging that (i) Fox retains its rights under the Fox Distribution Agreement and (ii) Fox asserts a security interest in the *Adventures from the Book of Virtues*.

10.      In furtherance of my efforts to liquidate the Assets on behalf of the Estates, I retained Focus to market and sell the Assets pursuant to order of the Court.

11.      As a result of marketing plan and persistent marketing efforts.  On or about June 22, 2018, the Buyer and I entered into the Agreement for the purchase price of $450,000.00.  A true and copy of the Agreement is attached hereto as **Exhibit A** and incorporated herein and into the Sale Motion by reference.

12.      The Buyer and I negotiated the Agreement at arms' length through our respective representatives.  To the best of my knowledge, neither my representatives nor I have any personal or business relationship with the Buyer, save and except for the transactions proposed in the Agreement.

13.      I believe that the proposed Sale serves the best interests of the Estates and their creditors.  Based on, among other things, the amount of the Purchase Price, the Buyer's demonstrated ability to close, I concluded that the Buyer has offered the highest and best price for the Assets.

14.      I do not believe that waiver will not result in any prejudice to any party as the Sale has been thoroughly marketed and all parties in interest have received notice of the Sale.

15.      I do not anticipate that the Sale will result in any tax consequences for the Estates.  However, if any taxes are owed by either of the Estates on account of the Sale, the Estates shall pay the same in accordance with the Bankruptcy Code and any and all other applicable law.

16.      I believe that the Overbid Procedures are reasonable and will serve to deter any casual bidders and protect the interests of the Estates.  The Overbid Procedures are not intended to deter *bona fide* parties or otherwise chill bidding.

1   I declare under penalty of perjury that the foregoing is true and correct.  Executed this 16th

2 day of July 2018, at Encino, California.

                    David K. Gottlieb

MOTION FOR SALE OF THE ESTATES' RIGHTS, TITLES AND INTERESTS IN THE DEBTORS' ASSETS

# Exhibit A

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "<u>Agreement</u>") is entered into by and between Legacy Distribution, LLC, a Georgia limited liability company (the "<u>Purchaser</u>"), and David K. Gottlieb (the "<u>Trustee</u>"), in his capacity as chapter 7 trustee for the bankruptcy estates (the "<u>Estates</u>") in the bankruptcy cases styled *In re Porchlight Entertainment, Inc.*, case no. 1:13-bk-14983-MB (the "<u>PEI Bankruptcy</u>"), and *In re Porchlight Distribution, Inc.*, 1:13-bk-16040-MB (the "<u>PDI Bankruptcy</u>" and, together with the PEI Bankruptcy, the "<u>Bankruptcy Cases</u>"), pending in the United States Bankruptcy Court for the Central District of California (the "<u>Bankruptcy Court</u>").  The Purchaser and the Trustee may be referred to herein collectively as the "<u>Parties</u>" and each individually as a "<u>Party.</u>"

## RECITALS

A.    On or about July 29, 2013, Porchlight Entertainment, Inc. ("<u>PEI</u>") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), thereby commencing the PEI Bankruptcy.  Thereafter, on or about September 17, 2013, Porchlight Distribution, Inc. ("<u>PDI</u>" and, together with PEI, the "<u>Debtors</u>") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the PDI Bankruptcy.  On September 23, 2013, PEI filed a motion to jointly administer the Bankruptcy Cases, which motion was granted by Bankruptcy Court order entered on or about September 25, 2013.

B.    On or about June 16, 2015, the Debtors moved to convert the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code.  The Bankruptcy Court granted the motion to convert by order entered on or about June 29, 2015.  Thereafter, on or about July 10, 2015, the Trustee was appointed as chapter 7 trustee for the Estates.

C.    At all relevant times, the Debtors were engaged in the development, production and/or distribution of various forms of entertainment, including, without limitation, films and television programs.  In the course of the enterprise, the Debtors developed, produced and/or distributed, among other titles, the TUTENSTEIN and the JAY JAY THE JET PLANE films and television series.  Upon the commencement of the Bankruptcy Cases, any and all assets of the Debtors became assets of the Estates pursuant to 11 U.S.C. § 541(a).

D.    On or about October 16, 2015, the Trustee entered into a stipulation (the "<u>Fox Stipulation</u>") with Twentieth Century Fox Film Corporation ("<u>Fox</u>") to assume the Distribution & Other Rights Acquisition Agreement dated as of March 21, 1996 (the "<u>Fox Distribution Agreement</u>"), which authorized Fox to exploit the animated television series titled ADVENTURES FROM THE BOOK OF VIRTUES in certain identified territories.  On or about October 20, 2015, the Bankruptcy Court entered an order approving the Fox Stipulation (the "<u>Fox Order</u>") and, thereby, the assumption of the Fox Distribution Agreement.  On or about January 26, 2016, the Trustee and Fox entered into a stipulation to amend the Fox Stipulation and order approving the same (the "<u>Amended Fox Stipulation</u>").  On or about February 1, 2016, the Bankruptcy Court entered an order approving the Amended Fox Stipulation and amending the Fox Order.

E.      On or about December 23, 2015, the Trustee filed the *Amended Omnibus Motion to Assume Executory Contracts* (the "Assumption Motion"), through which the Trustee moved to assume certain distribution agreements (collectively, the "Distribution Agreements").   On or about January 26, 2016, the Bankruptcy Court entered an order granting the Assumption Motion and approving the assumption of the Distribution Agreements (the "Assumption Order").

F.      On or about August 6, 2016, the Trustee entered into a *Settlement and Mutual Release Agreement* (the "Abadi Settlement") with Abadi & Co. ("Abadi") to resolve a dispute regarding the respective rights of the parties to the TUTENSTEIN and JAY JAY THE JET PLANE film and television series.   Pursuant to the Abadi Settlement, the Trustee and Abadi agreed to a joint sale of the film and television programs identified on Schedule A to the Abadi Settlement, including, without limitation, any and all copyrights, trademarks, domain names, websites, recordings, masters, and/or promotional materials.

G.      Thereafter, the Trustee entered into stipulations with Reel Works Studios and Animalia Productions Pty, Ltd.—thereby confirming that any and all of the rights, title and interests the Debtors may have held in THE ULTIMATE GIFT and ANIMALIA, respectively, terminated prior to the commencement of the Bankruptcy Cases and, thus, were not subject to sale by the Estates pursuant to the Abadi Settlement or otherwise.   Additionally, the Trustee entered into a stipulation with Fox acknowledging that (i) Fox retains its rights under the Fox Distribution Agreement and (ii) Fox asserts a security interest in the ADVENTURES FROM THE BOOK OF VIRTUES.

H.      On or about December 29, 2016, the Bankruptcy Court entered an order approving the Abadi Settlement, as modified and clarified pursuant to the related stipulations with Reel Works Studios, Animalia Productions Pty, Ltd., and Fox.

## AGREEMENT

**NOW, THEREFORE,** in consideration for the promises, mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree as follows:

1.      **BANKRUPTCY COURT APPROVAL.**  This Agreement shall not be deemed effective unless and until the Bankruptcy Court enters a final order[1] approving the Agreement without material modification pursuant to Section 363 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (the "Sale Order").   As soon as practicable following the execution of this Agreement, the Trustee shall file a motion seeking Bankruptcy Court approval of the Agreement. If the Bankruptcy Court denies the motion seeking approval of this Agreement or approves the Agreement subject to material modifications, the Agreement shall be deemed null, void *ab initio*, and unenforceable, unless the Parties both agree in writing to proceed forward under the Agreement despite the material modifications.   The date on which the Sale Order is entered

---

[1] An order shall be deemed a "Final Order" fifteen (15) calendar days after its entry *provided that* (a) no timely appeal has been filed challenging the order or, (b) if a timely appeal has been filed, no order staying the effect of the order has been requested or entered.   A notice of appeal shall be deemed timely if filed within the time allotted under Rule 8002 of the Bankruptcy Rules.

2

without material modification becomes a Final Order may be referred to hereinafter as the "Effective Date".

2. **ASSET ACQUISITION AND ASSIGNMENT.**  Subject to the terms contained herein, the Trustee agrees to sell, convey, assign and hypothecate on an AS IS, WHERE IS basis, without any representations or warranties, except as expressly set forth herein, and free and clear of any and all interests and encumbrances to the fullest extent permitted under section 363(f) of the Bankruptcy Code, to the Purchaser for the consideration provided herein, any and all of the rights, title and interests the Estates may have in and to the Estates' properties, assets and rights set forth herein below (hereinafter, sometimes referred to as the "Purchased Assets"), in accordance with, and with all protections afforded by, sections 363 and 365 of the Bankruptcy Code, as follows:

a. **Catalogue.**  The film and television programs identified on **Schedule A** hereto, and any and all intellectual property relating thereto, including, without limitation, the name Porchlight Entertainment, Inc. and the name Porchlight Distribution, Inc., and any and all associated copyrights, trademarks, domain names, websites, recordings, masters, and promotional materials of, related to and/or concerning the film and television programs identified on Schedule A in the possession, custody or control of the Trustee;

b. **Distribution Rights.**  The distribution rights to the film and television programs identified on **Schedule B** hereto (the "Distribution Rights");

c. **Contract Rights.**  All rights, title and interest arising from or relating to the Distribution Agreements assumed by and through the Assumption order; and

d. **Books and Records.** Any documents and records in the Trustee's possession directly related to the Purchased Assets; provided however, that the Purchaser shall make the documents and records available to the Trustee upon reasonable request in order to allow the Trustee to fulfill its duties necessary for the Bankruptcy Cases.

3. **OVERBID AND AUCTION.**  The sale of the Purchased Assets to the Purchaser pursuant to this Agreement (the "Sale") shall be subject to auction, which auction is generally referred to herein as an "Overbid Auction".  The Overbid Auction shall take place in the Bankruptcy Court during the hearing on the motion to approve this Agreement and the Sale (the "Sale Hearing") unless the Bankruptcy Court designates an alternate time and/or place for the Overbid Auction.

4. **CONSIDERATION.**  As consideration for the sale, conveyance, assignment and/or hypothecation of the Purchased Assets by the Estates to the Purchaser, the Purchaser shall pay the sum of FOUR HUNDRED FIFTY THOUSAND DOLLARS and zero cents ($450,000.00) (the "Purchase Price") as follows:

3

4838-5591-2288.1

a.    **Deposit.**  No later than five (5) business days after the execution of this Agreement, the Purchaser shall pay the sum of THIRTY FIVE THOUSAND DOLLARS ($35,000.00) (the "Deposit") via cashier's check made payable to "David K. Gottlieb, chapter 7 trustee" by delivering such cashier's check to the following address:

David K. Gottlieb
D. Gottlieb & Associates, LLC
17000 Ventura Blvd., Ste. 300
Encino, CA 91316

Payment shall be deemed made upon receipt.  In the event this Agreement is terminated in accordance with Paragraph 8, *infra*, or the Purchaser is not the ultimate purchaser of the Purchased Assets, the Purchaser shall be entitled to the return of the Deposit.  The Trustee shall return the Deposit no later than five (5) business days after the termination of this Agreement or consummation of a sale of the Purchased Assets to an alternate purchaser.

b.    **Residual Payment.**  On the Closing Date (defined *infra*), the Purchaser shall pay the greater of FOUR HUNDRED AND FIFTEEN THOUSAND DOLLARS ($415,000.00) or the ultimate purchase price of the Purchased Assets less the Deposit via cashier's check or wire transfer to an account designated by the Trustee.

c.    **Purchase Price Allocation.** In the event either of the Parties elect, in their sole and absolute discretion, to allocate the Purchase Price amongst one or more of the Purchased Assets, the Parties shall file a supplemental notice identifying such allocation.

5.    **PURCHASER PROTECTIONS.**  In recognition of the fees and expenses incurred by the Purchaser in submitting the offer reflected in this Agreement as well as the risk assumed by the Purchaser in serving as stalking horse bidder for the Sale, and as consideration for the benefits conferred upon the Estates by the Purchaser so serving, the Trustee shall seek Bankruptcy Court approval of the following protections for the Purchaser (collectively, the "Purchaser Protections"):

a.    **Break-up Fee.**  In the event the Estates sell, convey, assign and/or hypothecate the Purchased Assets to an individual or entity other than the Purchaser, then the Purchaser, in addition to the return of the Deposit in accordance with the provisions of  Paragraph 4, shall be entitled to a break-up fee in the amount of TEN THOUSAND DOLLARS and zero cents ($10,000.00) (the "Break-up Fee").  The Break-up Fee shall be paid no later than ten (10) business days after the Closing Date (defined infra), and shall be paid by check made payable to "Legacy Distribution" and delivered via U.S. Mail, postage prepaid, to the following address:

4

160 Trowbridge Road
Atlanta, GA 30350

Payment shall be deemed made upon dispatch.

b. **Refundable Deposit.** In the event the Estates sell, convey, assign and/or hypothecate the Purchased Assets to an individual or entity other than the Purchaser, the Purchaser shall be entitled to the return of the Deposit in accordance with the provisions of Paragraph 4.a.

c. **Overbid Procedures.** By and through the motion seeking approval of this Agreement and the Sale, the Trustee shall propose and seek approval of the following procedures for the Overbid Auction:

  i. Notice of Intent to Bid/Deposit. Any party interested in bidding on the Purchased Assets during the Overbid Auction shall submit a written notice of intent to bid along with proof of the financial ability to purchase the Purchased Assets on the same terms and timeline as this Agreement and provide a deposit in the amount of THIRTY-FIVE THOUSAND DOLLARS and zero cents($35,000.00) (the "Overbid Deposit") to the Trustee via Cashier's Check or money order no less than two (2) business days prior to the date first scheduled for the Sale Hearing;

  ii. Qualified Bidder. The Trustee shall determine in his sole and absolute discretion whether the proof of financial ability to consummate the Sale required by paragraph 5(c)(i) is sufficient to qualify the potential bidder to participate in the Overbid Auction. Only qualified bidders may participate during the Overbid Auction. If a potential bidder does not qualify, the bidder may object to his/her/its characterization as unqualified;

  iii. Minimum Initial Overbid/Bid Increments. The minimum initial overbid during the Overbid Auction shall be no less than FOUR HUNDRED AND SEVENTY-FIVE THOUSAND DOLLARS and zero cents ($475,000.00) (the "Initial Overbid") and, thereafter, each overbid shall be no less than TEN THOUSAND DOLLARS and zero cents ($10,000.00) (the "Bidding Increment") more than the immediately preceding bid. On the date of the Overbid Auction, any bidder (other than the Buyer) who has complied with the procedures identified herein and who is interested in presenting one or more overbid(s) at the Overbid Auction shall be required to present a cashiers' check(s) to the Trustee evidencing the maximum amount he/she/it is willing and able to overbid. In no event shall this amount be less than the Initial Overbid;

5

iv.   <u>Back-up Bidder</u>.   If multiple offers are presented during the Overbid Auction, the highest and best offer as determined by the Trustee in his sole and absolute discretion, shall be selected as the winning bid (the "<u>Winning Bidder</u>").  The individual or entity that offered the next highest and best offer (the "<u>Back-up Bid</u>") may elect to serve as the back-up bidder (the "<u>Back-up Bidder</u>").   In the event that (i) the Winning Bidder (other than the Purchaser) fails to close the Sale within the time allotted;  (ii) the Purchaser has elected to serve as the Back-up Bidder; and (iii) the Purchaser fails to purchase the Assets within the time allotted, the Trustee shall solely retain or be entitled to recover the  Deposit or Overbid Deposit, as applicable, as liquidated damages;

v.   <u>Overbid Deposit Return</u>.  With the exception of the deposits paid by the Winning Bidder and/or Back-up Bidder, all Overbid Deposits shall be returned no later than five (5) business days after the conclusion of the Overbid Auction.  If the Winning Bidder closes on the Sale, the Back-up Bidder shall be entitled to the return of his/her/its Overbid Deposit and/or any and all funds remitted to the Trustee in furtherance of the Purchase of the Assets no more than five (5) business days after the Closing Date;

vi.   <u>Bidding Order</u>.  Bidding during the Overbid Auction shall begin with the highest qualified overbid submitted prior to the Overbid Auction.   During the Overbid Auction, the Purchaser shall be entitled to offer the first bid in response to the opening bid. Thereafter, the order for the submission of bids shall be governed by the time at which the overbids were submitted prior to the Overbid Auction—the earliest overbid being entitled to submit the first bid after the Purchaser.  Unless otherwise ordered by the Bankruptcy Court, a bidder may abstain from submitting a bid in any round of bidding without waiving the right to submit a bid during a later round.  Bidding shall continue until a Winning Bidder and Back-up Bidder are selected; and

vii.   <u>No Telephonic Participation Permitted By Overbidders</u>. Except for the Purchaser or the Purchaser's designated agent, any overbidder who wishes to participate in the Overbid Auction must be present (whether in person or through a designated agent) thereat; no telephonic participation at the Overbid Auction will be permitted (except for the Purchaser or the Purchaser's designated agent).

d.   **Good Faith Purchaser.**  In seeking approval of this Agreement and the Sale, the Trustee shall request that the Bankruptcy Court find that the

6

Purchaser qualifies as a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

6.  **Purchaser Representations and Warranties.**  In conjunction with the Sale, the Purchaser makes the following representations and warranties:

    i.  The Purchaser is a limited liability company formed under the laws of the State of Georgia.  The Purchaser is in good standing and is authorized to conduct business within the state of its organization.

    ii.  The Purchaser has obtained any and all corporate approvals necessary to execute this Agreement and consummate the Sale on the terms set forth herein.

    iii.  The Purchaser has sufficient funds to consummate the Sale and make all payments required under this Agreement within the time allotted for such payments.

    iv.  The Purchaser acknowledges that the Trustee has not guaranteed the Purchaser Protections.  The Purchaser further acknowledges that whether such the Purchaser Protections are granted rests solely within the discretion of the Bankruptcy Court and, so long as the Trustee requests such –Purchaser Protections, that the denial or modification of any such  Purchaser Protections by the Bankruptcy Court shall not constitute a breach of this Agreement by the Estates or cause to terminate this Agreement (and/or Paragraph 8) or otherwise and recoup the Deposit.

    v.  The Purchaser acknowledges that the Trustee, as the Bankruptcy Court appointed fiduciary for the Estates, does not have personal knowledge regarding the Purchased Assets.

    vi.  The Purchaser acknowledges that the Sale transaction involves the sale, conveyance, assignment and/or hypothecation of the Estates' rights, title and interest in the Purchased Assets.

    vii.  Any omission or inaccuracy of any information and/or documentation provided by the Trustee and/or any of his agents shall not result in any claim by the Purchaser for damages or cause a material breach of this Agreement.  The Purchaser has not relied upon such information and documentation in deciding to proceed with the Sale; rather, the Purchaser has conducted independent due diligence regarding the Purchased Assets and has decided to proceed with the acquisition of the Purchased Assets based on the information it obtained through its independent research and analysis of the Purchased Assets.

7

viii.  The Purchaser represents and warrants that it is not an insider of either of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code.

## 7.  CLOSING.

(A) <u>In General</u>. The closing date of the Sale shall be the first business day after the Effective Date (the "<u>Closing Date</u>").  The Parties may agree to extend the Closing Date without further approval of the Bankruptcy Court.  Any agreement to extend or delay the Closing Date must be set forth in writing.  In no event shall the Closing Date occur more than thirty (30) calendar days after the Effective Date.

(B) <u>Trustee Deliveries at Closing</u>.  The Trustee shall deliver to the Purchaser, as applicable, all of the following:

(I)  a duly executed Bill of Sale substantially in the form of **Exhibit "A",** attached hereto and incorporated herein by reference;

(II)  a duly executed counterpart to the Assignment And Assumption of Contracts in the form of **Exhibit "B"**, attached hereto and incorporated herein by reference;

(III)  a duly executed counterpart to the Assignment of Certain Intellectual Property Rights in the form of **Exhibit "C"**, attached hereto and incorporated herein by reference; and

(IV)  such other duly executed bills of sale, assignments and other instruments of assignment, transfer or conveyance, in form and substance reasonably satisfactory to the Purchaser, as the Purchaser may reasonably request or as may be otherwise necessary to evidence and effect the sale, assignment, transfer, conveyance and delivery of the Purchased Assets and to put the Purchaser in actual possession and control of the Purchased Assets (all such deliveries referred to herein as the "Ancillary Agreements").

(C) <u>Post-Closing Covenants</u>.  The Parties agree as follows with respect to the period following the Closing Date: (i) If at any time after the Closing Date any further actions are necessary to carry out the purposes of this Agreement, each of the Parties shall make commercially reasonable efforts to take such further actions (including the execution and delivery of such further instruments and documents) as any other Party may reasonably request, all at the sole cost and expense of the requesting Party; (ii) in the event that and for so long as any Party actively is contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand in connection with (a) any transaction contemplated under this Agreement; or (b) any fact, circumstance, condition, activity, practice, plan, occurrence, event, incident, action, omission or transaction on or prior to the Closing Date involving the Estates, each of the Parties shall cooperate with the Party involved therein and its counsel in the contest or defense, and provide access to its books and records as shall be necessary in connection

8

with the contest or defense, all at the sole cost and expense of the contesting or defending Party; provided however, that nothing contained in this Agreement shall bar the closure or dismissal of the Bankruptcy Cases and the obligations of the Trustee herein shall terminate upon any such closure or dismissal.

8. **TERMINATION.** This Agreement may be terminated by either Party hereto through the provision of written notice of termination upon the occurrence of one or more of the following events:

   a. The Trustee fails to file a motion seeking approval of this Agreement and the Sale within thirty (30) days following the full and complete execution of this Agreement by both Parties;

   b. The Bankruptcy Court fails to enter the Sale Order, within One Hundred Twenty (120) days after the conclusion of the Sale Hearing;

   c. The Bankruptcy Court enters an order either (i) denying approval of this Agreement and the Sale or (ii) approving the Agreement subject to material modifications which are not approved by the Parties in accordance with Paragraph 1 of this Agreement; and

   d. The Bankruptcy Court approves the sale of the Purchased Assets to a third party and, in the event the Purchaser is the Back-up Bidder, such third party consummates the acquisition of the Purchased Assets.

   e. Breach by the Purchaser in accordance with Paragraph 9.

   f. Breach by the Estates in accordance with Paragraph 10.

Termination of this Agreement pursuant to this Paragraph 8 shall be without recourse to the terminating Party unless such termination violates this Agreement or any applicable law or independent grounds exist for the enforcement or an award of damages for the breach of this Agreement by the terminating Party.

9. **BREACH BY PURCHASER.** In the event the Purchaser fails to close the Sale or timely perform any obligation under this Agreement solely as a result of Purchaser's acts or omissions, the Purchaser and the Trustee acknowledge that it would be impractical and extremely difficult to estimate the damages the Estates will suffer as a result of such breach. Therefore, the Purchaser and the Trustee hereby agree that a reasonable estimate of the damages that the Estates would suffer in the event that the Purchaser defaults is and will be an amount equal to the Deposit. Such amount shall be the full, agreed upon and sole amount of monetary damages for default by the Purchaser under this Agreement, all other claims to damages or other remedies, including, without limitation, the remedy of specific performance, being hereby expressly waived by the Trustee. This Agreement will thereupon be terminated and neither Party will have any further rights or obligations hereunder. Notwithstanding anything in this Agreement to the contrary, the Purchaser shall not be in default with respect to any of its obligations hereunder unless and until (i) the Purchaser receives written notice from the Trustee specifying such default and the means/remedies to cure such default; and (ii) the Purchaser fails

9

to cure such default within five (5) business days from the receipt of such notice, except that no such cure period shall apply to a default by the Purchaser that is the failure to close the Sale on the Closing Date, as may be extended by the written agreement of the Parties.

10.   **BREACH BY THE ESTATES.**  In the event the Trustee or the Estates breach(es) any provision of this Agreement, the sole and exclusive remedies of the Purchaser shall be to return the Parties to the *status quo ante* through the rescission or termination of this Agreement and the return of any and all funds delivered to the Trustee and/or the Estates by the Purchaser in conjunction with this Agreement or the proposed Sale.  The Purchaser shall not be entitled to pursue or obtain any further or additional monetary damages or legal or equitable remedies against the Trustee, either of the Estates, or either of the Debtors.

11.   **ASSIGNMENT.**  The Purchaser may not assign this Agreement, or any rights hereunder, without the prior written consent of the Trustee.  Notwithstanding the foregoing, an assignment to an entity that is owned and controlled by the Purchaser or the members of the Purchaser, and that expressly assumes in writing all of the Purchaser's obligations hereunder (a "Permitted Assignee"), does not require the Trustee's written consent; *provided, however*, that any Permitted Assignee, concurrently with assuming the Purchaser's obligations under this Agreement, must make in writing the same representations and warranties (adapted as required for the type of entity and state of formation or incorporation) as the Purchaser has made under this Agreement, but if such Permitted Assignee fails to expressly do so, it shall be deemed to have made such representations and warranties by executing the assignment and assumption agreement with the Purchaser and the breach of any such representations and warranties shall have the same consequences as if the Purchaser had breached such representations and warranties.  The Purchaser will give the Trustee written notice of any Permitted Assignee or any other proposed assignee at least five (5) business days prior to the Closing Date, and the Purchaser shall remain liable for any monetary obligation of any Permitted Assignee.  No assignment will release the Purchaser from its obligations hereunder.

12.   **MISCELLANEOUS PROVISIONS.**

a.   **Partial Invalidity.**  If any term or provision of this Agreement or the application thereof to any individual or entity or particular circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to individuals or entities or particular circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

b.   **Waivers.**  No waiver of any breach of this Agreement, or any covenant or provision herein, shall be deemed a waiver of any preceding or succeeding breach thereof or of any other covenant or provision herein contained.  No extension of time for performance of any obligation or act shall be deemed an extension of time for performance of any other obligation or act.

c.   **Successors and Assigns.**  Subject to the limitations of Paragraph 11, *supra*, this Agreement shall be binding upon and shall inure to the benefit of the heirs, successors and assigns of the Parties hereto.

4838-5591-2288.1

**d.   Entire Agreement.**  This Agreement (including all schedules and exhibits attached hereto) is the final expression of, and contains the entire agreement between, the Parties with respect to the subject matter hereof and supersedes all prior understandings (including any so-called "term sheets" or "letters of intent") with respect thereto.

**e.   No Third-Party Benefit.**  Other than as expressly set forth in Paragraph 12.c., this Agreement is for the benefit of the Parties only and is not intended to and shall not confer any rights or benefits upon any other individual or entity.

**f.   Construction.**  Paragraph headings are solely for convenience, and are not a part of this Agreement.  Whenever required by the context of this Agreement, the singular includes the plural, the masculine includes the feminine and the neuter, and vice versa.  Unless otherwise indicated, all references to Paragraphs (and subparagraphs) are to Paragraphs (and subparagraphs) of this Agreement.  All exhibits and schedules referred to in this Agreement are attached and incorporated by this reference.  In the event the date on which the Purchaser or the Trustee is required to take any action under the terms of this Agreement is not a business day, the action will be taken on the next succeeding business day.

**g. Joint Authorship.**  This Agreement is the product of negotiation and preparation by and among each Party hereto, and each Party acknowledges that they have had the opportunity to consult with independent counsel of their choosing.  Accordingly, this Agreement and any ambiguities or uncertainties contained herein shall be equally and fairly interpreted and construed without reference to the identity of the individual or entity preparing this Agreement on the express understanding and agreement that the Parties participated equally in the negotiation and preparation of the Agreement or have had equal opportunity to do so.  Accordingly, the Parties hereby waive the benefit of California Civil Code section 1654 and any successor or amended statute, which provides that in cases of uncertainty, language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist, and any and all similar rule(s) and/or statute(s).

**h.   Governing Law/Forum Selection.**  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF.  By executing this Agreement, each of the Parties hereto hereby (1) irrevocably and unconditionally agrees that any legal action, suit or proceeding with respect to any matter under or arising out of or in connection with this Agreement shall be brought in the Bankruptcy Court and (2) irrevocably accepts and submits himself/itself to the exclusive jurisdiction of the Bankruptcy Court, generally and unconditionally, with respect to any such action, suit or proceeding, and consents to the entry of any final order or judgment by the Bankruptcy Court.  If the Bankruptcy Court lacks the requisite jurisdiction or authority to adjudicate any such disputes, the Parties hereto hereby consent to the jurisdiction and venue of the United States District Court for the Central District of California to resolve any such disputes.

**i.   Counterparts; Electronic Signatures.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Copies of signatures on documents transmitted by

email (in pdf format) or other electronic means shall be binding on the Parties, but the Parties shall deliver originals of any documents with signatures sent in such manner promptly thereafter.

**j. Volitional Execution.** Each Party hereto enters into this Agreement knowingly and voluntarily, in the total absence of any fraud, mistake, duress, coercion, or undue influence and after careful thought and reflection upon and consultation with independent counsel regarding this Agreement and the matters referred to herein, or an adequate opportunity to do so; and, accordingly, by signing this Agreement, each Party signifies full understanding, agreement, and acceptance.

**k. Amendment.** This Agreement may be amended, altered, modified, or otherwise changed in any respect or particular only by a writing duly executed by the Parties hereto or their authorized representatives.

**l. Authority.** Subject only to Bankruptcy Court approval, the Parties represent and warrant to the others that each has all requisite power and authority to enter into this Agreement and perform its respective obligations hereunder. Each signatory represents and warrants to the Parties that he or she has the authority to execute this Agreement on behalf of the Party they purportedly represent and thereby bind such individual or entity to this Agreement.

**m. Cooperation.** The Parties shall execute any additional documentation reasonably necessary to effectuate the intent and purpose of this Agreement. The Parties shall not take any action or counsel or assist any other individual or entity to take any action to interfere with or impede the performance of this Agreement or any provision thereof.

**n. Notices.** All notices hereunder shall be deemed given upon dispatch if in writing and delivered via email and U.S. Certified Mail, postage prepaid, to the following addresses:

|  |  |
|---|---|
| **To the Trustee:** | David K. Gottlieb |
|  | D. Gottlieb & Associates, LLC |
|  | 17000 Ventura Blvd., Ste. 300 |
|  | Encino, CA 91316 |
|  | Email: dgottlieb@dkgallc.com |
|  |  |
|  | With copy to: |
|  |  |
|  | Ashley M. McDow, Esq. |
|  | Fahim Farivar, Esq. |
|  | **FOLEY & LARDNER LLP** |
|  | 555 South Flower Street, Ste. 3500 |
|  | Los Angeles, CA 90071-2411 |
|  | Email:   amcdow@foley.com |
|  |     ffarivar@foley.com |

4838-5591-2288.1

**To Purchaser:**        Dana Webber
Legacy Distribution, LLC
160 Trowbridge Road
Atlanta, GA 30350
With copy to:

Stuart B. Mager, Esq.
The Mager Law Firm, LLC
4360 Chamblee Dunwoody Rd.
Suite 500
Atlanta, GA 30341

A Party may change the designated recipient or address(es) for the provision of notice(s) under this Agreement by transmitting a notice of address or recipient change by the means specified in this Paragraph.  Any address or recipient change shall be deemed effective upon receipt.  Any notices transmitted prior to receipt of a notice of address or recipient change shall be deemed valid and effective.

**[SIGNATURE PAGE TO FOLLOW]**

4838-5591-2288.1

**By Chapter 7 Trustee**

Dated: July _10_, 2018

By: _____

David K. Gottlieb, solely in his capacity as the
Chapter 7 Trustee


**By Legacy Distribution, LLC:**

Dated: July _____, 2018

_____

Legacy Distribution, LLC, a Georgia limited
liability company

By: Dana Webber
Its: President


**APPROVED AS TO FORM:**

Dated: July _10th_, 2018            **FOLEY & LARDNER LLP**

*Ashley M. McDow*
_____
Ashley M. McDow, Esq.

[Proposed] Attorneys for David K. Gottlieb,
Chapter 7 Trustee


Dated: July _____, 2018            **THE MAGER LAW FIRM, LLC**

_____
Stuart B. Mager, Esq.

Attorneys for Legacy Distribution, LLC


14

**By Chapter 7 Trustee**

Dated: July _____, 2018

By: _____
    David K. Gottlieb, solely in his capacity as the
    Chapter 7 Trustee

**By Legacy Distribution, LLC:**

Dated: July __6__, 2018

*Dana Webber*

_____
Legacy Distribution, LLC, a Georgia limited
liability company

By: Dana Webber
Its: President

**APPROVED AS TO FORM:**

Dated: July _____, 2018

**FOLEY & LARDNER LLP**

_____
Ashley M. McDow, Esq.

[Proposed] Attorneys for David K. Gottlieb,
Chapter 7 Trustee

Dated: July 6th, 2018

**THE MAGER LAW FIRM, LLC**

_____
Stuart B. Mager, Esq.

Attorneys for Legacy Distribution, LLC

14

4838-5591-2288.1

### Schedule A

- *Adventures from the Book of Virtues* (Series); 39 x 30; 1996-1998 Children's Classic Tales (Compilation ABOV); ABOV Christmas Carol Specials
- *Four Eyes* (Series); 26 x 30; 2006
- *Jay Jay the Jet Plane* (Series) 65 x 30; 2001 – 2005; Christian Episodes; all DVD Compilations
- *The Christmas Dinosaur* (Feature) 1 x 60; 2004
- *The Haunted Pumpkin of Sleepy Hollow* (Feature) 1 x 60; 2003
- *Tutenstein* (Series); 39 x 30; 2003
  *Tutenstein: Clash of the Pharaohs* (Feature); 1 x 71; 2008
- *Inspirational Baby Songs* (Feature) 1 x 60; 2003
- *A Martian Christmas* (Feature) 1 x 60; 2008

4838-5591-2288.1

## Schedule B

The Distribution Rights pertain to the following titles:

- *Cheating Fate (aka Time and Again)*
- *Deadly Season:  The Secret of Hidden Lake (aka Open Season)*
- *Fireball*
- *Hell's Rain (aka Anna's Storm)*
- *Her Sister's Keeper (aka Sisters - Two Sisters)*
- *Inhabited*
- *Landslide*
- *Lightning:  Bolts of Destruction (aka Lightning II, Heaven's Fury, Lightning Alley)*
- *Past Tense*
- *Personal Effects*
- *Secrets of Pine Cove (aka Ashes to Ashes)*
- *The Family Holiday (aka The Holidays)*
- *Witness To Murder (aka Witness: The Deadly Truth, Who Will Save My Daughter, Cry Wolf) \**
- *12 Dogs of Christmas*
- *Best Friends (aka Best Friend)*
- *Dino Dan*
- *Inferno (aka Firestorm)*
- *The Light Before Christmas*


- *Martian Christmas Carol*
- *Murder on Spec (aka Trophy Wife)*
- *Ricky Sprocket Showbiz Boy*
- *Something Fishy*
- *Treasure Island Kids 1: The Battle of Treasure Island*
- *Treasure Island Kids 2: The Monster of Treasure Island*
- *Treasure Island Kids 3: The Mystery of Treasure Island*
- *War Child*
- *Will to Succeed*
- *Aqua Teen Hunger Force \*\**
- *The Great Polar Bear Adventure \*\**
- *Holidaze: The Christmas That Almost Didn't Happen \*\**
- *Kissing Cousins \* \**
- *A Month of Sundays \*\**

16

- *Owd Bob*
- *Normal ***
- *The Note ***
- *Passchendaele ***
- *Rain ***
- *Small Miracles (aka Taliesan Jones) ***
- *Spooky Bats & Scaredy Cats ***
- *The Stepson ***
- *Together Again for the First Time ***
- *Towards Darkness ***
- *Tripping the Wire ***
- *Tristan & Isolde ***
- *White Air ***
- *Welcome to Paradise ***

* Parties are aware that the Debtors have provided no documentation regarding the chain of title for this distribution right.

** Parties are aware that the distribution right has already expired.

17

# Exhibit A

**EXHIBIT "A"**

**<u>BILL OF SALE</u>**

This **BILL OF SALE** (the "Bill of Sale") is made, executed and delivered effective as of the ___ day of _____, 2018 (the "Effective Date"), by and between David K. Gottlieb, solely in his capacity as chapter 7 trustee for  the bankruptcy estates (the "<u>Estates</u>") in the bankruptcy cases styled *In re Porchlight Entertainment, Inc.*, case no. 1:13-bk-14983-MB (the "<u>PEI Bankruptcy</u>"), and *In re Porchlight Distribution, Inc.*, 1:13-bk-16040-MB (the "<u>PDI Bankruptcy</u>" and, together with the PEI Bankruptcy, the "<u>Bankruptcy Cases</u>"), pending in the United States Bankruptcy Court for the Central District of California (the "<u>Bankruptcy Court</u>") (the "Seller"), and Legacy Distribution, LLC, a Georgia limited liability company (the "Purchaser").  Purchaser and Seller may be referred to herein collectively as the "<u>Parties</u>" and each individually as a "<u>Party.</u>" Unless otherwise defined herein, capitalized terms appearing in this Bill of Sale shall have the same meanings ascribed to such terms as in the Asset Purchase Agreement dated June ___, 2018 (the "Agreement") by and between the Parties.

**WHEREAS**, Purchaser and Seller entered into the Agreement whereby Purchaser agreed to purchase certain assets of the Estates identified in the Agreement (the "Purchased Assets");

**WHEREAS,** on _____, the Court approved the Agreement.

**WHEREAS**, in connection with the Agreement, Seller desires to sell, transfer, assign and otherwise grant unto Purchaser the Purchased Assets, and Purchaser desires to purchase, accept and receive the Purchased Assets pursuant to the terms and conditions of the Agreement, and as set forth herein;

**NOW THEREFORE**, pursuant to the terms of the Agreement, Seller hereby transfers to Purchaser, all of Seller's rights, title and interests in the Purchased Assets, for a consideration of _____ (the "<u>Purchase Price</u>"), which has been acknowledged to have been received by Seller.

The sale and transfer of the Purchased Assets is made on an "as is, where is" basis, without any representations or express and implied warranties, unless otherwise set forth in the Sale Agreement which is incorporated herein by reference, and pursuant to the order of the Bankruptcy Court approving the Agreement pursuant to, among other things, 11 U.S.C. § 363(f) entered on or about _____.

**1.  <u>Binding Effect.</u>**  This Bill of Sale will be binding upon, and will inure to the benefit of, the Seller, Purchaser, and their respective successors and assigns.

**2.  <u>Governing Law.</u>**  This Bill of Sale will be governed by and construed and enforced in accordance with the laws of the State of California, without reference to its conflict of laws principles.

1

     **3.**  **Counterparts.**  This Bill of Sale may be executed by original signature in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

     **4.**  **Continuing Obligations.**  Nothing contained in this Bill of Sale will be deemed or construed as relieving the Seller or Purchaser of their respective duties and obligations under the Agreement.

     **IN WITNESS WHEREOF**, Seller and Purchaser have caused this Bill of Sale to be duly executed on this ___ day of _____2018.

**By Chapter 7 Trustee on behalf of
the Estates ("Seller")**

Dated:  _____, 2018

                By:     _____

                       David K. Gottlieb, solely in his capacity as the
                       Chapter 7 Trustee

**By Legacy Distribution, LLC ("Purchaser"):**

Dated: _____, 2018

                       _____

                       Legacy Distribution, LLC, a Georgia limited
                       liability company

                       By: Danna Webber
                       Its:  President

# Exhibit B

19

## EXHIBIT "B"

## ASSIGNMENT AND ASSUMPTION OF ASSUMED CONTRACTS

This **ASSIGNMENT AND ASSUMPTION OF ASSUMED CONTRACTS** (the "Catalogue Assignment") is made and entered into as of this _____ day of _____, 2018 ("Effective Date"), by **DAVID K. GOTTLIEB** David K. Gottlieb, in his capacity as chapter 7 trustee for the bankruptcy estates (the "Estates") in the bankruptcy cases styled *In re Porchlight Entertainment, Inc.*, case no. 1:13-bk-14983-MB (the "PEI Bankruptcy"), and *In re Porchlight Distribution, Inc.*, 1:13-bk-16040-MB (the "PDI Bankruptcy" and, together with the PEI Bankruptcy, the "Bankruptcy Cases"), pending in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") ("Assignor"), and **LEGACY DISTRIBUTION, LLC**, a Georgia limited liability company ("Assignee"). Assignor and Assignee may be referred to herein collectively as the "Parties" and each individually as a "Party." Unless otherwise defined herein, capitalized terms appearing in the Catalogue Assignment shall have the same meanings ascribed to such terms as in the Asset Purchase Agreement dated July ___, 2018 (the "Agreement") by and between the Parties.

**WHEREAS**, pursuant to the terms of the Agreement, Assignor is selling and/or assigning to Assignee all of the Estates' rights, title and interest in and to certain film and television programs, which are more particularly described and set forth on Schedule A to the Agreement (hereinafter, the "Catalogue").

**NOW THEREFORE**, in consideration of the mutual covenants contained in the Catalogue Assignment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **ASSIGNMENT**.  Assignor hereby assigns and transfers to Assignee and its successors and assigns, all of the Estates' rights, title, claim and interest in, to and under the Catalogue. The assignments made hereunder are made in accordance with and subject to the terms of the Agreement.  Without limitation to the foregoing, and in accordance with the terms of the Agreement, Assignor assigns with the Catalogue all associated income, royalties, damages and payments, if any, due from or payable by any third party (including, without limitation, damages and payments for past, present, or future infringements or misappropriations thereof) and any and all corresponding rights.

2. **ACCEPTANCE OF ASSIGNMENT.**  Assignee hereby accepts the foregoing Assignment contemplated herein and assumes any and all obligations arising from or related to the Purchased Assets following the Closing Date.

3.    **BINDING EFFECT.**  The Catalogue Assignment shall be binding upon, and shall inure to the benefit of, the Parties and their respective successors and assigns.

1

4.     **GOVERNING LAW.**  The Catalogue Assignment shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflicts of laws principles.

5.     **COUNTERPARTS.**   The Catalogue Assignment may be executed by original signature, and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.     **THEAGREEMENT.**  Nothing contained in the Catalogue Assignment shall be deemed or construed as relieving the Assignor or Assignee of their respective duties and obligations under the Agreement.

**THIS CATALOGUE ASSIGNMENT HAS BEEN EXECUTED BY ASSIGNOR AND ASSIGNEE AS OF THE EFFECTIVE DATE.**

**By Chapter 7 Trustee on behalf of
the Estates ("ASSIGNOR")**

Dated:  _____, 2018

By:     _____
        David K. Gottlieb, solely in his capacity as the
        Chapter 7 Trustee

**By Legacy Distribution, LLC ("ASSIGNEE"):**

Dated: _____, 2018

_____
Legacy Distribution, LLC, a Georgia limited
liability company

By: Danna Webber
Its:  President

2

# Exhibit C

4838-5591-2288.1

## EXHIBIT "C"

### ASSIGNMENT OF CERTAIN INTELLECTUAL PROPERTY RIGHTS

This **ASSIGNMENT OF CERTAIN INTELLECTUAL PROPERTY RIGHTS** (this "IP Assignment") is made as of ___, 2018 by **DAVID K. GOTTLIEB**, solely in his capacity as chapter 7 trustee for the bankruptcy estates (the "Estates") in the bankruptcy cases styled *In re Porchlight Entertainment, Inc.*, case no. 1:13-bk-14983-MB (the "PEI Bankruptcy"), and *In re Porchlight Distribution, Inc.*, 1:13-bk-16040-MB (the "PDI Bankruptcy" and, together with the PEI Bankruptcy, the "Bankruptcy Cases"), pending in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") ("Assignor"), and **LEGACY DISTRIBUTION, LLC**, a Georgia limited liability company ("Assignee"). Assignor and Assignee may be referred to herein collectively as the "Parties" and each individually as a "Party." Unless otherwise defined herein, capitalized terms appearing in the IP Assignment shall have the same meanings ascribed to such terms as in the Asset Purchase Agreement dated July ___, 2018 (the "Agreement") by and between the Parties.

**WHEREAS**, Assignee and Assignor have entered into the Agreement whereby Assignee agreed to purchase from the Assignor certain assets of the Estates;

**WHEREAS**, in connection with the Agreement, Assignor desires to assign to Assignee all of the Estates' rights, title and interests in film and television programs identified on **Schedule A** of the Agreement and distribution rights to the film and television programs identified on **Schedule B** of the Agreement (collectively, the "IP Assets"); and

**WHEREAS**, Assignor has agreed to assign the IP Assets to Assignee and Assignee has agreed to accept such assignment from Assignor;

**NOW THEREFORE**, pursuant to the Agreement, and in consideration of the mutual covenants contained therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed:

1. **Assignment**. Assignor hereby sells, assigns, conveys and transfers unto Assignee all of the Estates' right, title and interest in, to and under the IP Assets together with (a) all associated common law rights, and (b) all rights and privileges granted and secured thereby, including, without limitation, the right to sue and recover for any past or continuing infringement or misappropriation of the IP Assets as well as the right to seek any and all remedies available at law or in equity in connection therewith. Without limitation to the foregoing, Assignor assigns with the IP Assets all associated income, royalties, damages and payments, if any, due from or payable by any third party (including, without limitation, damages and payments for past, present, or future infringements or misappropriations thereof) and any and all corresponding rights.

2. **No Further Use.** Assignor and the Estates agree that they will make no further use of the IP Assets, including without limitation, with governmental authorities.

    **3.**   **Benefit.**  All right, title and interest in the IP Assets shall be held and enjoyed by Assignee, for its own use and benefit and for the use and benefit of its successors, assigns and other legal representatives, as fully and entirely as the same would have been held and enjoyed by the Assignor if this IP Assignment had not been made.

    **4.**   **Binding Effect.**  This IP Assignment and the covenants and agreements contained herein shall be binding upon Assignor and its successors and assigns, and the Estates and their successors and assigns, and shall inure to the benefit of Assignee and its successors and assigns.

    **5.**   **Governing Law**.  This IP Assignment shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflicts of laws principles.

    **6.**   **Counterparts.**  This IP Assignment may be signed in any number of counterparts, each of which shall be an original and, when taken together, shall constitute one agreement.

    **7.**   **Other Agreements.**  Nothing contained in this IP Assignment shall be deemed or construed as relieving the Assignor or Assignee of their respective duties and obligations under the Agreement.

    **IN WITNESS WHEREOF**, the parties have caused this IP Assignment of Certain Intellectual Property Rights to be executed as of the date first written above.

**By Chapter 7 Trustee on behalf of
the Estates ("ASSIGNOR")**

Dated:   _____, 2018

                        By:   _____
                                David K. Gottlieb, solely in his capacity as
                                Chapter 7 Trustee

**By Legacy Distribution, LLC ("ASSIGNEE"):**

Dated: _____, 2018

                                _____
                                Legacy Distribution, LLC, a Georgia limited
                                liability company

                                  By: Danna Webber
                                Its:  President

## DECLARATION OF PHILIP FIER

I, Philip Fier, hereby declare:

1.     I am at least 18 years of age and of sound mind.  I submit this declaration in support of the Sale Motion.  Unless otherwise defined herein, all capitalized terms shall have the same meaning as ascribed to them in the Sale Motion.

2.     I am the manager of Focus Advisory Services, LLC ("Focus").  Unless otherwise stated, I have personal knowledge of the matters set forth herein, and if called as a witness, could and would competently testify to the same.

3.     Focus is the broker for the Estates and was retained to market and sell the Assets and represent the Estates in the negotiation of any sale agreement(s) for the same.  In the course of its employment, Focus provided the following services, among others:

      a.     Created a pitch deck to provide to potential buyers;

      b.     Created and maintained a digital data room with salient documents, including, without limitation, chain of title documentation, distribution agreements and internal management reports (to the extent provided by the Estates);

      c.     Responded to questions and/or concerns from potential buyers regarding the Assets; and

      d.     Assisted in negotiating the terms of the Agreement with the Buyer.

4.     The Trustee received several offers to purchase the Assets, and the Buyer's offer represents the highest and best offer for the Assets.

5.     I believe that the proposed Purchase Price ($450,000.00) represents a fair market value for the Assets.

6.     Notwithstanding the foregoing, I continue to market the Assets to potential overbidders.

///

- 24 -

1          I declare under penalty of perjury that the foregoing is true and correct.  Executed this

2    _____ day of July 2018, at _____, California.

3

4                                                                              _____

5                                                                                Philip Fier

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR SALE OF THE ESTATES' RIGHTS, TITLES AND INTERESTS IN THE DEBTORS' ASSETS

1       I declare under penalty of perjury that the foregoing is true and correct.  Executed this

2    16th day of July 2018, at _Los Angeles_, California.

3

4                         _____

5                         Philip Fier

MOTION FOR SALE OF THE ESTATES' RIGHTS, TITLES AND INTERESTS IN THE DEBTORS' ASSETS

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
11601 Wilshire Blvd., Suite 1400, Los Angeles, CA 90025-0509

A true and correct copy of the foregoing document entitled (*specify*): **MOTION FOR ENTRY OF ORDER (A) APPROVING SALE OF THE ESTATES' RIGHTS, TITLES AND INTERESTS IN THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 363(b) AND (f), (B) FINDING BUYER QUALIFIES AS A GOOD FAITH PURCHASER PURSUANT TO 11 U.S.C. § 363(m), (C) APPROVING OVERBID PROCEDURES, AND (D) WAIVING FED. R. BANKR. P. 6004(h) STAY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On July 19, 2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On July 19, 2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Hon. Martin R. Barash
United States Bankruptcy Court
Central District of California
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on July 19, 2018, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 19, 2018 | Karla Hernandez | /s/ Karla Hernandez |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August  2010*                                                                          **F 9013-3.1.PROOF.SERVICE**

**1.** **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

David E Ahdoot     dahdoot@bushgottlieb.com, mrodriguez@bushgottlieb.com
Fahim Farivar     ffarivar@foley.com,
David Keith Gottlieb (TR)     dkgtrustee@dkgallc.com,
dgottlieb@iq7technology.com,rjohnson@dkgallc.com,akuras@dkgallc.com
Stephen E Hyam     shyam@clarktrev.com
Joseph A Kohanski     jkohanski@bushgottlieb.com, mrodriguez@bushgottlieb.com
Kathleen M Kushi Carter     kathy.carter@piblaw.com
Leib M Lerner     leib.lerner@alston.com, autodockettest-lax@alston.com
Craig G Margulies     Craig@MarguliesFaithlaw.com, Victoria@MarguliesFaithlaw.com;Brian@MarguliesFaithlaw.com
Ashley M McDow     amcdow@foley.com, mdelaney@foley.com;sgaeta@foley.com;rojeda@foley.com;ffarivar@foley.com
S Margaux Ross     margaux.ross@usdoj.gov
Scott C Timpe     stimpe@mbnlawyers.com, scott.timpe@gmail.com;aacosta@mbnlawyers.com
United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov
Michael H Weiss     mw@weissandspees.com, lm@weissandspees.com


**3. Via Email**
Consensus Securities LLC: bwhite@consensusadvisors.com
The Zirlin Corp. dba Designworks: don@dzynwrx.com


**Porchlight Library Sale**

| | | |
|---|---|---|
| Bridgestone Media Group | Pat Smith | psmith@gobmg.com |
| Content Media | Rick Kwak | rick.kwak@contentmediacorp.com |
| Creative Trust Ventures | Stewart Heath | stewart.heath@creativetrust.com |
| Film Rise | Goetz Grossman | goetz@filmrise.com |
| Foxfield Entertainment | Bruce Johnson | bruce@foxfieldentertainment.com |
| Gapstone | Dino de Angelis | adeangelis@gapstone.com |
| Go Digital | Tara Lattomus | tlattomus@eckertseamans.com |
| LHB Ventures | | lhbcompanies@gmail.com |
| MarVista Entertainment | Stephanie Slack | sslack@marvista.net |
| Multicom | Karyn Ulman | karyn@multicom.tv |
| Quickliquidity.com | Jack Miller | jmiller@quickliquidity.com |
| Reservoir | Rell LaFargue | rl@reservoir-media.com |
| Royalty Exchange | Gary Young | gary@royaltyexchange.com |
| Samuel Goldwyn | Ben Feingold | ben@samuelgoldwyn.com |
| Shout Factory | Garson Foos | gfoos@shoutfactory.com |
| Victor Advisors/WeKids Asia | Daniel Victor | dan@victoradvisors.com |
| Vine | Rob Amir | Rob.Amir@vai-llc.com |
| West Coast Servicing | Matthew Clark | mclark@wcrsi.com |
| | Peter Bergmann | Peterb@porchlight.com |
| | | gsv@themoviestudio.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                      **F 9013-3.1.PROOF.SERVICE**